MAX RAND, PLAINTIFF IN ERROR, v. SAMUEL ARMM, DE-
FENDANT IN ERROR.

Submitted March 25, 1907—Decided June 17, 1907.

If a trial court, in directing a verdict, assumes or decides a material
  fact as to which a different conclusion might legitimately be
  reached upon the testimony, the resulting judgment will be set
  aside upon error.

On error to the Supreme Court.

The following is the statement of the case made by the trial
court in directing a verdict (a diagram shows the *locus in
quo*):

```
+----------------------------------------------+----------+
|                                              |          |
|           |                                  |          |
|           |          X|                      |          |
| - - - - - | - - - - - | - - - - - - - - - - -|          |
|           |           |                      |          |
|  Beck     | Keeple    |  Beihler             |          |
|           |           |                      |          |
| - - - - - | - - - - - +--------------+       |          |
|                       |              |       |          |
|    Defen|dant         |  Plaintiff   |       |          |
|                       |              |       |          |
|  No 55     No 53      |  No 51     G |       |          |
+-----------------------+--------------+-------+----------+
```

Broome St.

```
+----------------------------------------------------------+
|                                                          |
|                                                          |
+----------------------------------------------------------+
```

"The consideration which I have been able to give this case
since the hour of adjournment yesterday afternoon has led me
to the conclusion that there is no controverted fact in the case,
the settlement of which by you would determine to any extent
the rights of the parties to this litigation. The situation, as

the proofs have developed it, is this: In 1851 a man named Joseph Bechler, or Beihler, was the owner of Nos. 51, 53 and 55 Broome street, in Newark, adjoining lots. Those lots were, each of them, one hundred feet deep. Beihler, being the owner, conveyed the middle lot, No. 53, to a man named Wendell Keeple, by a proper deed of conveyance. In that deed he inserted this provision: 'The said Joseph Beihler agrees that the said Keeple, his heirs and assigns, shall have the free use of a passageway three feet wide, running from Broome street thirty-nine feet along the north end of the said Joseph Beihler's house.' I gather from that clause in the deed, and from the pleadings in the case, Joseph Beihler was occupying one of the three houses, and that was the house alongside of which this alley ran. The proofs show that that was No. 51. So, you will see that, by the deed made by Joseph Beihler to Wendell Keeple, Beihler agreed that Keeple and his heirs and assigns should have the use of the alley running by his residence. The deed goes on to say, also, 'The said Joseph Beihler agrees and reserves fifteen feet in depth along the rear of the house he now occupies and the two houses adjoining on the south [that is, the houses on Nos. 53 and 55], to be used in common by himself, his heirs and assigns, with Wendell Keeple and Conrad Beihler, their heirs and assigns, forever.' The legal effect of that provision in that deed by Beihler to Keeple was this: He granted to Keeple a right to use the alleyway for the purpose of passing backward and forward from No. 55, the rear of No. 55, to the public street. He also granted to Keeple the right of using a strip five feet wide in the rear of his, Beihler's, residence, for the purpose of enabling Keeple to get from No. 55 to the rear of the three-foot alley, which was on the north side of Beihler's residence. Whether that provision with relation to the fifteen-foot strip granted anything more or not is not material in the case. It at least granted to Keeple the right to pass across the rear of No. 51 to get to the three-foot alley, and so go on out to the street. You will see that this deed reserves to Beihler the right to use fifteen feet of the lot which he conveyed to Keeple, that is, No. 53. The scheme

was to reserve a strip fifteen feet wide running across the whole of these three lots, just in the rear of the houses, for the use of Keeple and himself, and another man, whose interest does not appear. Now, so far as he granted to Keeple the right to use this, he was charging the property which he occupied, No. 51, where he lived, and No. 55, the rear property. He was granting to Keeple something more than the ownership of lot No. 53. He was granting him a use in the property which he still occupied, and, in the grant of No. 53, he was keeping out something for himself. That is, he said by this deed, 'Keeple, I grant you a right to pass over this fifteen-foot strip on my home lot, No. 51, and also on No. 55, and I reserve to myself the right to pass across a fifteen-foot strip on your lot, No. 53.' Now, the purpose for which Mr. Beihler reserved to himself the right to pass backward and forward across that strip on No. 53 does not appear in the deed, but we have it from the proofs that there was a well, either on that lot No. 53 or perhaps on lot No. 55, which was used in common by the occupants of all three of these lots, and it may be that it was for the purpose of preserving the benefit of that well to the different owners of the lots that this provision was put in. The provision which I have read was put in the deed not only for the benefit of Mr. Keeple, and for the benefit of Mr. Beihler, but for those who should come after them in the ownership of the property. In other words, it was put in for the benefit of the property, and the man who bought the property bought it with that benefit attached to it.

"Shortly after the grant to Keeple, Beihler conveyed his home lot, No. 51, the lot where the alley was, to Mr. Holzhauer, and he made that conveyance before the deed which he made to Keeple had been put on record, and unless Holzhauer knew of the conveyance to Keeple, and knew what was in it, he was taking lot No. 1 free from this servitude, as we lawyers call it. But I think the evidence shows that he knew about it, notwithstanding the deed was not on record, because his son testified that while he was a boy living there with his father, those who owned lot No. 53 used the alleyway, and that his father's family used the fifteen-foot strip for the pur-

pose of going backwards and forwards to the well. Now, Mr. Beihler having charged No. 51 with that servitude in favor of No. 53—that is, having granted to the owner of No. 53 an easement—a way across the back of lot No. 51, and so on through the alleyway, that easement descended to the different purchasers as they bought No. 53, unless something was done between 1851 and the time of bringing this suit to wipe it out. About six years, or five years, after Mr. Keeple bought No. 53, Mr. Beihler sold No. 55 to a man named Beck, and some years after Beck purchased No. 55 he purchased No. 53 from a gentleman who in the meantime had acquired it, and as the owner of those two properties, you see, he became entitled, as an appurtenance to these two properties, to the easement across lot No. 51, across that fifteen-foot strip, and down through the alley; that is, the right to pass backward and forward from his own property, across lot No. 51, and through the side alley out to the street and back again, when he wanted to.

"Now, the claim on the part of the plaintiff, who is the present owner of lot No. 51, is that that whole easement was wiped out when Mr. Beck, as the testimony shows, being the owner of these two properties, refused to permit the people who lived in No. 51 any longer to come on No. 55 or No. 53. You will remember from the testimony that after the well ran dry, or after the cat fell in the well, perhaps, that well was closed. So far as it had been used for a water-supply it was abandoned. The aqueduct water was put in the buildings, in No. 51 at least, and the well finally filled up, and after that Mr. Beck said to the people living in No. 51, 'You can't come on my property any more,' his idea apparently being that the right to go on No. 51 and No. 53, which had been reserved in this deed to Keeple, was limited to the purpose of getting water, and when the ability to get water was terminated, the right to go backwards and forwards was terminated, and on that theory he said to the occupants of No. 51, 'Keep off my lot hereafter.' But, although he said that, and enforced what he said by acts when it was necessary, he did not abandon his right to pass over No. 51. He continued

to exercise that right, although he refused to recognize the
right of the occupants of No. 51 to come on his land. So
there was no abandonment by Mr. Beck of his right to use
this way, and his conduct in refusing to recognize the right
of the occupant of No. 51 to come on his land does not operate
to extinguish the easement which, as owner of No. 53, he had
in lot No. 51. He, as I say, continued to use that way. The
amount of the user is immaterial. He used. it apparently
when he desired. When .the members of his family or the
occupants of his property desired, they used it. Now, it is
said that some years ago a colored woman, Mrs. Bruce, I think
her name was, who was living in No. 51, assumed the right to
stop the user of that way by occupants of No. 53; that the
alleyway on the side of No. 51 opened into the street; that
there was a door there, and that she kept that door locked, and
kept the key, so it could not be used by anybody except herself
or those whom she permitted to use it. Well, without stop-
ping to consider whether she had any right to do that, or
whether that conduct could be effective as against the owner
of No. 53, it seems to me that the proof is immaterial in de-
termining the rights of the parties, for this reason: This
right of way or right of passage was created by deed, and it
continues to exist, as a matter of law, until it is terminated
either by the acts of the parties or by the act of one of the
parties. I have already said that Mr. Beck did nothing to
terminate it. So far as the case shows, nobody who holds title
from Mr. Beck has done anything to terminate it. The only
way the owner of No. 51 could terminate it against the will
of the owner of No. 53 was by doing something which was in
defiance of the right of the owner of No. 53 to enjoy the way
—doing something, for instance, such as this colored woman
did, putting up a barrier which prevented its use. And that
condition of affairs must continue for fully twenty years in
order to wipe out the right of way, and the evidence in this
case, as I recall the testimony of the colored policeman, that
his mother had only lived on this block, I think in No. 53,
for awhile, or No. 55, and afterwards in No. 51 for a period
beginning some sixteen years ago; he did not know just how

long, perhaps a little longer, perhaps a little shorter; that she originally lived in No. 53 or No. 55, and afterwards moved into No. 51, but he did not know when she moved into No. 51. In order to show that there was an extinguishment of this easement, the burden rested upon the plaintiff to show that there had been such an interruption, such a defiance, of the rights of the owner of the easement as I have mentioned, and that that continued for twenty years; that for twenty years the owner of No. 53 had been deprived, by the act of the owner of No. 51, or those representing him, from enjoying this easement, and that has not been shown. The case presents a pure question of law on the admitted facts, and on those facts I charge you that the defendant, Armm, who is the owner of Nos. 53 and 55, holds that property with the right to use this way over No. 51, and that, so far as the proofs go, nothing has occurred to determine that right since it was originally created by Mr. Beihler in 1851. That being so, the result is that Mr. Armm was justified, when the plaintiff barred that gate against him, which prevented him from going through the alley, in using such force to remove the barrier as the occasion required, and he consequently is entitled to your verdict. Gentlemen of the jury, you may render a verdict in favor of the defendant without leaving your seats."

For the plaintiff in error, *Frank E. Bradner.*

For the defendant in error, *Samuel W. Beldon.*

The opinion of the court was delivered by

GARRISON, J. In addition to the comprehensive statement of the case made by the trial court, two references to the diagram may be useful. The letter X marks the two-foot opening by which the defendant was enabled, upon leaving his building by a rear door, to pass on to the right of way claimed by him over the plaintiff's lot. The letter G indicates the gate maintained by the plaintiff across the three-foot alley,

the breaking of which by the defendant constituted the trespass for which the action was brought.

The trial below resulted in the direction of a verdict for the defendant, which was excepted to and has been assigned as error.

In directing a verdict, the trial court avowedly decided two matters of fact adversely to the plaintiff in error, viz., *first,* that Holzhauer, a predecessor in the plaintiff's chain of title, had notice of the fifteen-foot easement created by the unrecorded deed of Beihler to Keeple, and *second,* that there had been no abandonment of the said easement by Beck, who was a predecessor in the defendant's chain of title.

We think that each of these questions should, to say the least, have been submitted to the jury.

*First.* Beihler's deed to Keeple for lot No. 53, which created the easement in 1851, was not recorded within fifteen days, and not until after Beihler's subsequent deed to Holzhauer for lot No. 51 had been recorded, hence a search made by subsequent grantees of Holzhauer's title would not have disclosed the deed under which the defendant claims. There being, therefore, no constructive notice of the easement, the burden was upon the defendant to prove actual notice in the plaintiff or those under whom he claims. This the defendant attempted to do as to Holzhauer, but the only testimony adduced for this purpose was that of Holzhauer's son, who remembered that when he was a boy living with his father on lot No. 51, the occupants of lot No. 53 passed over his father's lot to reach the alley. This, however, was presumably while the witness' father occupied lot No. 51 under his deed from Beihler, for no prior occupancy is even hinted at, hence such user, even if established, did not constitute proof of a notice to Holzhauer at a period when it would have been of any avail to charge his title. Moreover, Holzhauer and several successive grantors of lot No. 51, when they came to convey, made no mention in their deeds of the easement in question, which was not, in a technical sense, an apparent one. The question of actual notice was therefore one for the jury, unless

indeed a directed verdict for the plaintiff would have been proper.

*Second.* With respect to the fact of the abandonment of the easement by Beck, we also think that a jury question was presented by the proofs. The erection by this grantor in the defendant's title of a building covering the entire easement upon lots Nos. 53 and 55 was some evidence of an abandonment as to lot No. 51, especially in view of the reciprocal character of the original easement. It unquestionably showed an intention to destroy the original easement to some extent— to what extent was for the jury.

For these trial errors the judgment must be reversed.

*For affirmance*—None.

*For reversal*—The Chancellor, Garrison, Fort, Hendrickson, Pitney, Swayze, Reed, Trenchard, Bogert, Vredenburgh, Vroom, Green, Gray, Dill, J.J. 14.